## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| VESPER MARITIME LIMITED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 2:19-cv-56-NT |
| | ) | |
| LYMAN MORSE BOATBUILDING, | ) | |
| INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Vesper Maritime Limited ("**VML**") asserts various claims in admiralty and pursuant to state law against Defendant Lyman Morse Boatbuilding, Inc., ("**Lyman Morse**") in order to recover damages resulting when VML's sailing yacht, the *S/Y Vesper* ("***Vesper***" or the "**vessel**"), fell over in Lyman Morse's boatyard. Before me is the Plaintiff's motion ("**Pl.'s Mot.**") (ECF No. 130) seeking summary judgment on five of the Plaintiff's admiralty claims, as well as on the Plaintiff's contention that an adverse inference is warranted due to Lyman Morse's alleged spoliation. For the reasons stated below, I **DENY** the Plaintiff's motion.

## BACKGROUND

### I.   *Vesper*'s Return to the Lyman Morse Boatyard

Throughout 2016 and 2018, *Vesper* utilized a boatyard (the "**boatyard**" or "**yard**") operated by Lyman Morse in Thomaston, Maine, for various maintenance and repair projects. Def. Lyman Morse's Resp. to Requests to Strike (Incorporating

all Factual Statements) ("**SOF**")[1] ¶¶ 4, 6 (ECF No. 144); Def. Lyman Morse's Answer to Pl. VML's Am. Compl. ("**Def.'s Answer**") ¶ 2 (ECF No. 122-2). Captain Phillip Henderson, who has captained *Vesper* since 2015, represented VML in *Vesper*'s dealings with Lyman Morse. SOF ¶¶ 8, 79.

On November 4, 2018, *Vesper* departed the boatyard and was en route to Antigua when Captain Henderson began to have difficulties with the vessel's steering system. SOF ¶¶ 12–13. Captain Henderson decided, with the agreement of Lyman Morse, to return to the boatyard. SOF ¶¶ 14–16. Once there, Lyman Morse personnel hauled *Vesper* and temporarily stored the vessel in the slings of the yard's travel lift.[2] SOF ¶¶ 17, 19–20.

Over the next few days, Captain Henderson and the Lyman Morse yard crew examined *Vesper* and tried to fix the problem with the rudder that Captain Henderson had identified. Dep. of Captain Phillip Henderson ("**Henderson Dep.**") 135:23–136:4 (ECF No. 123). By November 7, it became apparent that the repairs were going to take longer than expected and that *Vesper* would need to be moved to the yard's storage area in order to free up the travel lift for other boats. SOF ¶ 120;

---

[1]     The following background is drawn from the parties' combined statements of fact ("**SOF**") (ECF No. 144) or directly from documents in the summary judgment record, which is found at ECF Nos. 122–29, 132–33, and 138 (the "**Record**"). The Defendant objects to some of the Plaintiff's statements of fact, *see* SOF ¶¶ 6, 15, 24, 27, 31, 34, 38, 39, 53–55, 61–64, 72, 73, while the Plaintiff requests to strike some of the Defendant's statements of fact, *see* SOF ¶¶ 84, 93–94, 98, 103–05, 110, 116, 118, 127–28. I need not address most of these objections or requests to strike, because I do not rely on any of the statements of fact to which the Defendant objects or that the Plaintiff moves to strike. Even if I were to grant all of these objections and requests to strike, there would remain genuine issues of material fact in the Record with regard to each of the claims and issues on which the Plaintiff seeks summary judgment. Only one of the Defendant's objections requires resolution, and I address it below.

[2]     A travel lift is essentially a specialized crane used to lift boats out of the water and transport them around boatyards.

Henderson Dep. 137:7–22, 138:7–9. The vessel was moved to the yard's storage area, where Lyman Morse personnel supported the vessel's weight on its keel fin, which was placed on plywood and blocked, fore and aft, beneath the bulb of the keel. SOF ¶¶ 22, 32. Boat stands were used to support the vessel and maintain its upright position. SOF ¶¶ 32, 121. While *Vesper* was in the storage area, it remained rigged and provisioned. SOF ¶¶ 36, 119.

## II.   Standing *Vesper*

When standing vessels in the yard, the Lyman Morse yard crew uses boat stands manufactured by Brownell Boat Stands, Inc., ("**Brownell**") and consults Brownell's manual and the guidelines published by the American Boat and Yacht Council ("**ABYC**"). SOF ¶ 23.

*Vesper* is ninety-five feet long with a waterline length of eighty-one feet. SOF ¶ 2. Brownell bases its guidelines around "the length" of the boat. Brownell Boatstands User Manual ("**Brownell Manual**") 4 (ECF No. 122-3); Brownell Website 2–3 (ECF No. 129-6). It is not clear whether this refers to the full length of the boat or the waterline length. For sailboats greater than fifty-five feet in length, the Brownell manual recommends using a minimum of thirteen stands, spaced evenly apart. Brownell Manual 2, 4. Brownell's website refers to this thirteen-stand benchmark as the "Basic Recommendation[]" and says that for longer sailboats, a minimum of five boat stands should be used, plus "another set every ten feet." Brownell Website 3, 6. Brownell also recommends using an extra pair of stands for rigged sailboats to "ensure that the vessel remains safe in heavy winds." Brownell Website 1; Brownell Manual 4. Similarly, if the boat is heavy in the bow or the stern,

3

the Brownell guidelines recommend using "an extra stand for support to reduce the amount of pressure on the hull." Brownell Website 3. Brownell also recommends using V-stands under the bow of all fin keel construction or bow-heavy sailboats and under the stern of fin keel construction or stern-heavy sailboats. Brownell Website 6.

The ABYC guidelines recommend that, for a boat the size of *Vesper*, pairs of boat stands be spaced no greater than ten feet apart, with the forward-most and aft-most pairs no more than ten feet from the ends of the waterline. ABYC TY-28 Boat Lifting & Storage ("**ABYC Guidelines**") 7 (ECF No. 126-4). The ABYC guidelines also contemplate that more stands "may" need to be used depending, for example, on the "hull configuration and structure, windage, weather and ground conditions." ABYC Guidelines 7. Additional support "may" also be required for "[b]oats stored with masts stepped," and "[a]dditional attention to stands may be required . . . before, during, and after storms." ABYC Guidelines 7–8. The ABYC guidelines note that they are "entirely voluntary" and based on "the consensus of knowledgeable persons . . . in the field of small craft," and they also recommend following stand manufacturers' guidelines. ABYC Guidelines 7, 9.

Lyman Morse contends that it used fifteen stands to support *Vesper*, seven per side plus a bow stand. Dep. of James Todd ("**Todd Dep.**") 60:7–14 (ECF No. 124-3). Captain Henderson recalls that at least twelve stands were used, as well as additional support. Henderson Dep. 116:2–6, 119:15–20. He acknowledges that fifteen stands may have been used, but he is unsure. Henderson Dep. 16:2–11.

4

Jake Ecker, Lyman Morse's yard foreman, had the principal responsibility at Lyman Morse to ensure the proper standing and storage of boats in the yard. Dep. of Jake Ecker ("**Ecker Dep.**") 4:13–16, 5:13–18 (ECF No. 124-1). When a boat remains rigged, he does not typically add more stands than he normally would. Ecker Dep. 17:13–19. But there are other precautions that the yard might use, such as adding granite blocking. Ecker Dep. 17:22–18:5. That was not done with *Vesper*. Ecker Dep. 18:6–7. In situations involving bad weather, this granite blocking might also be used, and halyards might be used to secure the mast. Ecker Dep. 19:12–20.

The parties dispute who had the ultimate responsibility for ensuring that *Vesper* was properly standed and, in particular, how much control Captain Henderson had over the storage of *Vesper* once it was hauled out of the water. Captain Henderson acknowledges that while he relinquishes physical control, to an extent, to the yard,[3] he always retains the ability to provide input if he has concerns about how the boat is being handled. Henderson Dep. 59:17–60:8. For example, if he saw a member of the yard crew place a stand under *Vesper* in a way "that was likely to cause damage to the boat," he "would expect to have control over" rectifying the problem and he would expect that the yard crew would listen to what he was saying. Henderson Dep. 60:10–19. This is because, as the captain of the vessel, he always has the ability to stop, correct, or guide actions by the yard crew. Henderson Dep. 60:20–61:8, 62:4–10.

In terms of the division of responsibility between the captain and the yard, Captain Henderson equates control with responsibility; that is, the party with control

---

[3]     For example, once the boat is in the travel lift, he would be powerless to stop the travel lift driver from pushing the wrong button. Dep. of Captain Phillip Henderson 59:23–25 (ECF No. 123).

over a situation is responsible for that situation's outcome. He acknowledges that he is responsible for "matters that [he could] have or [did] have control over," meaning "[a]nything connected to[,] inside, on, [or] around the boat itself." Henderson Dep. 123:7–19. But when a vessel is in the yard, he is not responsible for "the safety of anything going on around the boat under the yard's control." Henderson Dep. 58:25–59:9.

Lyman Morse sees things a bit differently. Lyman Morse acknowledges that it is entirely responsible for a boat's safety where an owner drops a vessel off and relinquishes control to the yard, but it contends that when a vessel has a full-time professional captain at the yard (as with *Vesper*), it is that captain who is in charge. Dep. of Michael Carr 72:9–14 (ECF No. 124); Todd Dep. 26:2–22. In other words, when there is a captain present in the yard, the captain retains control over the vessel, and the yard crew will consult the captain "for everything that [they] do to those boats." Todd Dep. 26:17–22; *see* Remote Dep. of Matthew B. Graham ("**Graham Dep.**") 78:4–25 (ECF No. 124-5); Dep. of Stephen Tofield ("**Tofield Dep.**") 7:16–22 (ECF No. 124-2). This does not mean, however, that captains have free rein to act as they please around the Lyman Morse yard. For example, a captain may not adjust the stands supporting his/her vessel. SOF ¶¶ 28–29. If stands need to be adjusted, the standard protocol at Lyman Morse is that the captain would ask the yard crew to adjust the stands, and then the yard crew would make the adjustment. Tofield Dep. 14:1–8.

## III.   The Fall of *Vesper*

Late in the afternoon on Friday, November 9, 2018, Captain Henderson and Stephen Tofield, the Lyman Morse service manager, met to discuss the weather

forecast for the weekend and concerns about wind speed. SOF ¶¶ 9, 44; Def.'s Answer ¶ 16. Mr. Tofield looked up the forecast from the National Weather Service on his computer, and he showed it to Captain Henderson. SOF ¶ 134. Captain Henderson and Mr. Tofield have similar recollections of this meeting, but they disagree as to the apportionment of responsibility for the ultimate decision that *Vesper* was secure.

Captain Henderson says that he consulted Mr. Tofield about the likelihood of severe weather or strong winds, "but this was discounted as being a problem due to the moderate forecast" and the way in which *Vesper* was positioned in the yard. Henderson Dep. 112:21–113:2. Captain Henderson thus made the decision that *Vesper* would be secure "in consultation with" Mr. Tofield "based on [Mr. Tofield's] local knowledge and experience with the area" and based on Mr. Tofield's recommendation. Henderson Dep. 147:2–20. Captain Henderson acknowledges that he must be mindful of the weather even when *Vesper* is out of the water, and he also acknowledges that if he had had any concerns at the time, he would have expressed them to Mr. Tofield. Henderson Dep. 67:4–12, 147:11–13. In sum, Captain Henderson indicates that while he agreed with Mr. Tofield's ultimate conclusion, this was at least in part due to deference to Mr. Tofield.

Mr. Tofield portrays the decisionmaking process as a more collaborative one. He says that both he and Captain Henderson were concerned about the wind but that, after looking at the weather forecast, they were not "overly" concerned. Tofield Dep. 9:23–10:12. He and Captain Henderson both determined that *Vesper* would be fine. Tofield Dep. 13:18–21.

7

If, after this meeting, any decisions had been made to change how *Vesper* was stored or standed due to the weather, those changes would have been implemented by the yard crew. Tofield Dep. 10:13–18. Mr. Tofield did not have any conversations with the yard crew after this meeting. Tofield Dep. 10:19–22. Shortly after this meeting, Captain Henderson and the Lyman Morse yard crew left the yard for the weekend. SOF ¶¶ 51–52.

Overnight, there was a storm in the area of the boatyard with high wind gusts that downed power lines and trees. SOF ¶ 137. At approximately 4:00 in the morning on November 10, Lyman Morse personnel discovered that, at some point in the prior twelve hours, *Vesper* had fallen over onto its side. SOF ¶¶ 56–57. Those at the scene were concerned about the prospect of a fuel spill or a fire, or that *Vesper* might collapse. SOF ¶¶ 141, 153. Together, Captain Henderson and the members of the Lyman Morse yard crew worked, in the darkness and through the continuing wind and rain, to cordon off the area and to remove debris. SOF ¶¶ 58, 141, 152, 154. Captain Henderson saw Lyman Morse personnel removing some equipment from the scene and was not consulted about this. Henderson Dep. 154:3–19. Captain Henderson did not try to stop these efforts to secure the scene, although he did check with VML's insurance representative to see "if the removal of all of this stuff was appropriate." SOF ¶ 142; Henderson Dep. 160:5–12. The insurance representative told Captain Henderson that Lyman Morse had a responsibility to mitigate any further damage to *Vesper* and that they should be allowed to do what was necessary to contain the problem. Henderson Dep. 160:18–161:7.

8

Matthew Graham, one of the Lyman Morse staff members at the scene, asked Lyman Morse's insurance broker whether it was permissible to move boat stands that were twisted and mangled. Graham Dep. 84:21–85:4. The insurance broker told Mr. Graham that they could remove anything that they deemed to be unsafe, including the stands, as long as they documented the scene. Graham Dep. 85:1–5.

Once it was light enough outside, a Lyman Morse staff member took photographs of the scene while other Lyman Morse personnel continued to take security measures. SOF ¶ 155. And in the days following, Mr. Graham worked with other Lyman Morse personnel and counsel to tag and preserve the stands that had been used to support *Vesper*. Aff. of Matthew Graham ¶ 14 (ECF No. 132).

## IV.   After the Fall

Three days after the fall, on November 13, Nautilus Investigations, an investigation team hired by VML, sent a preservation letter to Mr. Graham requesting that *Vesper* and all "equipment and fittings" (e.g., boat stands) "that [were] in use or [were] nearby at the time of the incident" be preserved "and maintained in the state that existed immediately after the incident." Letter from Nautilus Investigations to Matthew Graham ("**Nautilus Letter**") 1 (ECF No. 129-1). The letter also requested that any equipment that had been moved or removed "be identified and returned and secured for inspection." Nautilus Letter 1.

Representatives of both parties attended a joint inspection of the scene on November 15, 2018, (the "**joint inspection**") followed by four additional joint inspections and surveys in the following four weeks. SOF ¶¶ 157–59. Lyman Morse allowed surveyors representing both parties to have full access to *Vesper* and to the

equipment that had been involved in storing the vessel. SOF ¶ 158. This included all boat stands that had been used, including those that had been damaged and those that had since been repurposed for use on other boats. SOF ¶ 158. Captain Henderson was at the boatyard the week after the fall, and periodically thereafter, throughout which times he had full access to the boatyard, *Vesper*, and the equipment used to secure *Vesper*. SOF ¶ 162.

On December 4, 2018, after four of these joint inspections or surveys had occurred, counsel for VML, Andrew Bate, sent a letter[4] to counsel for Lyman Morse "reiterat[ing]" and "re-emphasiz[ing] the importance of preservation of evidence." Letter from Andrew Bate to Twain Braden ("**Bate Letter**") 2 (ECF No. 129-2). In this letter, Mr. Bate alleges that in addition to the movement of physical evidence in the hours following the incident, "[m]uch of this evidence [has] been moved again and some 're-purposed' for operations at the boatyard." Bate Letter 2. Mr. Bate thus requested "that all relevant evidence be identified, collected, and sequestered in a safe place pending a full and complete investigation as to causation and damages." Bate Letter 2. Lyman Morse contends that it tagged and presented all fifteen stands that it had used to stand *Vesper* during the joint inspection. Email from Twain Braden to Andrew Bate (Jan. 18, 2019, 09:54 a.m.) (ECF No. 129-3).

---

[4]     The Defendant contends that the letters exchanged between counsel after the fall of *Vesper* are inadmissible hearsay. SOF ¶ 61. I disagree. It is apparent that the Plaintiff is using these letters to demonstrate that VML put Lyman Morse on notice of its preservation wishes. *See* Mot. for Partial Summ. J. in Favor of Pl., VML ("**Pl.'s Mot.**") 14–17 (ECF No. 130) ("VML was again put on notice of the need to preserve the evidence . . . ."). These letters are not being used for the truth of the matter asserted and are therefore not hearsay. *See* Fed. R. Evid. 801(c)(2).

In January 2019, Mr. Graham learned that the surveyors were claiming that they had only inspected fourteen of the fifteen stands that Lyman Morse allegedly used. SOF ¶ 163. He thus asked Mr. Ecker (the yard foreman) to ensure that each stand was labeled, photographed, and secured for inspection, if necessary. SOF ¶ 163. After Lyman Morse personnel re-labeled and photographed the fifteen stands, counsel for Lyman Morse provided the photographs to counsel for VML. Email from Twain Braden to Andrew Bate (Jan. 23, 2019, 5:04 p.m.) (ECF No. 129-4).

The Plaintiff asserts twelve causes of action in its Amended Complaint,[5] Am. Compl. (ECF No. 39), and now moves for summary judgment on five of them, Pl.'s Mot. 1–14. These five causes of action, all in admiralty, are Breach of the Warranty of Workmanlike Performance (Count One), Breach of Maritime Contract (Count Two), Negligence under General Maritime Law (Count Three), Maritime Bailment (Count Four), and *Res Ipsa Loquitur* under Maritime Law (Count Five). Am. Compl. ¶¶ 28–50. The Plaintiff also seeks summary judgment on the issue of spoliation and contends that Lyman Morse's alleged spoliation warrants an adverse inference or the exclusion of evidence. Pl. Mot. 14–17.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "it can be resolved in favor of either party," and a

---

[5]    The Amended Complaint asserts thirteen causes of action, Am. Compl. (ECF No. 39), but the parties have previously stipulated to the dismissal of Count Nine, Stip. of Dismissal as to Count IX of Pl.'s Am. Compl. (ECF No. 48).

fact is "material" if "it has the potential of affecting the outcome of the case." *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (internal quotation marks omitted). The moving party bears the initial burden of showing that no such dispute exists, and the nonmoving party must then respond "with sufficient evidence to allow a reasonable jury to find in its favor with respect to each issue on which it has the burden of proof." *Id.* (internal quotation marks omitted). " 'The role of summary judgment is to pierce the pleadings' and probe the proof to ascertain whether a need for trial exists." *Theriault v. Genesis HealthCare LLC*, 890 F.3d 342, 348 (1st Cir. 2018) (quoting *Kearney v. Town of Wareham*, 316 F.3d 18, 21 (1st Cir. 2002)).

In reviewing a motion for summary judgment, I must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015). But I am "not obliged either 'to draw unreasonable inferences or credit bald assertions [or] empty conclusions.' " *Theriault*, 890 F.3d at 348 (quoting *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007)); *see also Barros-Villahermosa v. United States*, 642 F.3d 56, 58 (1st Cir. 2011) ("Mere allegations, or conjecture unsupported in the record, are insufficient." (internal quotation marks omitted)). Still, "summary judgment is improper when the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." *Morales-Melecio v. United States (Dep't of Health & Human Servs.)*, 890 F.3d 361, 368 (1st Cir. 2018) (internal quotation marks omitted).

## DISCUSSION

### I.  Counts Three, Four, and Five – Negligence, Bailment, and *Res Ipsa Loquitur*

The Plaintiff's negligence, bailment and *res ipsa loquitur* claims all sound in negligence, and the latter two claims hinge on whether Lyman Morse had exclusive control of *Vesper*. I consider these three claims together, beginning with the issue of exclusive control.

### A.  Exclusive Control

When an owner delivers goods to another for a specific purpose, and those goods are accepted with the promise of return once that purpose has been fulfilled, a bailment has been created. *Goudy & Stevens, Inc. v. Cable Marine, Inc.*, 924 F.2d 16, 18 (1st Cir. 1991). A bailee is liable for negligence where the bailor can prove that the bailee negligently performed its duties and that negligence was the proximate cause of any damage that occurred. *Id.* Because "the bailee is generally in a better position than the bailor to ascertain the cause of" any loss, a presumption of negligence is often appropriate where the plaintiff proves delivery of, plus the failure to return, the thing bailed. *N. Ins. Co. of N.Y. v. Point Judith Marina, LLC*, 579 F.3d 61, 69–70 (1st Cir. 2009) (quoting *Goudy*, 924 F.2d at 19). But this presumption does not apply where possession of the damaged bailed property was not exclusive to the bailor. *Id.* at 70.

This "does not mean that any act of dominion by the bailor over the vessel . . . negate[s] the inference" of negligence, but "possession and control must be of such a nature as to permit a reasonable trier of fact to infer that the bailee is in the better,

or sole, position to explain what actually happened." *Goudy*, 924 F.2d at 19. "[W]here both parties have 'equally unrestricted access' " or where the plaintiff has the ability to "interfere[] with [the defendant's] control over the boat," this presumption does not apply. *Point Judith*, 579 F.3d at 70 (quoting *Goudy*, 924 F.2d at 19).

Just as exclusive control is a prerequisite to invoke the presumption of negligence in the bailment context, it is also a necessary component of the doctrine of *res ipsa loquitur*. Under this doctrine, a finder of fact may "infer negligence from the unexplained happening of an event" if the thing causing the injury was within the exclusive control of the defendant, the injury is one that would not normally occur in the absence of negligence, and the plaintiff was not contributorily negligent. *Great Am. Ins. Co. v. Pride*, 847 F. Supp. 2d 191, 205 (D. Me. 2012).

The Plaintiff's evidence of exclusive control is not sufficient to warrant summary judgment. While it is clear that Lyman Morse alone could adjust the boat stands, it is not clear what level of control Captain Henderson and Lyman Morse had over the *decision* to adjust the boat stands. Notably, Captain Henderson acknowledges that he always retained the ability to correct mistakes by the yard crew and that he was in control of anything around the vessel, which presumably would have included the boat stands. Given my obligation to construe the facts in the light most favorable to the Defendant, I must conclude at this stage that even though Captain Henderson could not have physically added or adjusted the boat stands himself, he still had the obligation to ensure the vessel's safety, which included the obligation to ensure that the yard crew adjusted the boat stands if he thought that

14

*Vesper* was improperly standed. Whether Captain Henderson did in fact have this obligation remains a genuine issue of material fact, and summary judgment is not warranted as to the issue of exclusive control. That necessarily means that summary judgment is not warranted as to the Plaintiff's *res ipsa loquitur* claim.

### B.    Negligence

Without sufficient evidence of exclusive control, the Plaintiff cannot invoke a presumption of negligence on the bailment claim or through the doctrine of *res ipsa loquitur*. And without this presumption of negligence, the bailment claim essentially collapses into the negligence claim. *See Goudy*, 924 F.2d at 18 (explaining when bailee is liable for negligence). It is the Plaintiff's obligation to prove for both the bailment and negligence claims that Lyman Morse breached a duty of care. *See id.*; *Pride*, 847 F. Supp. 2d at 203.

There are multiple genuine issues of material fact relating to whether Lyman Morse breached a duty of care in its handling of *Vesper*. I highlight three here. First, even assuming that the ABYC guidelines and the Brownell manual establish the standard of care[6] (which the Defendant contests), and even setting aside the fact that they are not necessarily consistent with one another, the issue of whether Lyman Morse violated these standards remains in dispute.

---

[6]    While the ABYC and Brownell standards are undoubtedly relevant to the issue of negligence, they are not necessarily dispositive. *See N. Ins. Co. of N.Y. v. Point Judith Marina, LLC*, 579 F.3d 61, 69 (1st Cir. 2009) ("[W]e recognize such standards as some evidence of what a reasonable person would do, not as a definitive statement of [a party's] obligations."); *Keller v. United States*, 38 F.3d 16, 25–26 (1st Cir. 1994) (concluding that the existence of industry standards creates "some tendency to make it more or less likely that the defendant . . . would have regarded [them] as a minimum safety standard for the industry").

It is clear that under the ABYC guidelines, a minimum of seven pairs of stands should have been used—one pair ten feet from the end of the waterline, with each pair no more than ten feet beyond that point. However, because *Vesper*'s waterline length is eighty-one feet long, this would leave the seventh pair eleven feet from the end of the waterline, more than the minimum ten feet outlined in the ABYC guidelines. That begs the question of whether an additional pair was necessary or whether just one additional stand (as Lyman Morse claims to have used) was satisfactory.[7] The ABYC guidelines do not answer this question, even in the context of the remainder of the Record.

Of course, this does not account for the fact that *Vesper*'s mast remained rigged, nor does it account for any potential weather concerns (which I discuss further below). But the ABYC Guidelines are general and equivocal about the need for additional support where the mast remains rigged or in the event of bad weather. In both circumstances, the guidelines say additional support "may" be needed, implying that in at least some circumstances it would not be. Based on the lack of clarity in the ABYC guidelines, I cannot conclude that additional support was required here and thus that Lyman Morse was necessarily negligent.

Brownell's recommendations raise even more questions. This is primarily because Brownell's guidelines refer to "the length" of the boat, and it is not clear whether that is a reference to the full length of the boat or merely the length at the

---

[7] At the summary judgment stage, I must credit Lyman Morse's contention that it used fifteen stands.

waterline. In construing this fact in the light most favorable to the Defendant, I interpret it to be referring to the waterline.

Brownell's recommendation to use a minimum of five stands, plus "another set every ten feet," is another source of confusion. It is not clear whether the "another set every ten feet" benchmark includes those five stands. Nor is it clear how to count the V-stand. Nor do the Brownell guidelines indicate whether stands should be placed ten feet from the end of the waterline, as is recommended by the ABYC. The opacity and ambiguity of these recommendations render them relatively useless at the summary judgment stage.

A second genuine issue of material fact stems from who had the ultimate responsibility to ensure that *Vesper* remained properly secured. Even assuming that *Vesper* was not properly standed, it is not clear whether the fault lies with Captain Henderson, with Lyman Morse, or some combination of the two.

A third genuine issue of material fact arises from the disagreement about Captain Henderson's and Mr. Ecker's takeaways from their conversation about the weather forecast. The parties agree that Captain Henderson and Mr. Ecker both concluded that the weather would not be overly severe and that *Vesper* would be safe. However, Mr. Ecker frames the decision as having been jointly made, while Captain Henderson says that he relied on Mr. Tofield's experience in the area and on his recommendation. It is thus not clear whether Captain Henderson and Mr. Tofield unreasonably interpreted the forecast, and, if they did, who is at fault.

17

These genuine issues of material fact, and others, preclude summary judgment on the bailment and negligence claims.

## II.   Counts One and Two – Breach of the Warranty of Workmanlike Performance and Breach of Maritime Contract[8]

That there remain genuinely disputed material facts as to whether Lyman Morse acted negligently is not dispositive of the Plaintiff's breach of warranty and contract claims. Service contracts governed by maritime law contain an implied warranty of workmanlike performance, *see Parks v. United States*, 784 F.2d 20, 26 (1st Cir. 1986), which requires "the ship repairer to use the degree of diligence, attention and skill adequate to complete the task," *La Esperanza de P.R., Inc. v. Perez y Cia. de P.R., Inc.*, 124 F.3d 10, 19 (1st Cir. 1997) (internal quotation marks omitted) (emphasis deleted).

The implied warranty of workmanlike performance does not necessarily require proof of negligence, but it does not impose a standard of strict liability either. *Fairest-Knight v. Marine World Distribs., Inc.*, 652 F.3d 94, 99 (1st Cir. 2011). It is not the case "that once a shipyard has undertaken to repair a boat, any subsequent breakdowns or problems may, without more, be presumed to have been caused by the

---

[8]     The Plaintiff's breach of contract claim appears to be duplicative of its claim for a breach of the warranty of workmanlike performance. The Amended Complaint and the Plaintiff's motion say only that Lyman Morse breached the contract by failing to carry out the repairs that it promised to complete; however, the Plaintiff never specifies the breach of an express contractual term or what repairs Lyman Morse failed to carry out. Am. Compl. ¶ 34; Pl.'s Mot. 11. Indeed, in its Amended Complaint, the Plaintiff partially describes this alleged breach using the language of a breach of the warranty of workmanlike performance. *See* Am. Compl. ¶ 34 ("Lyman Morse breached its contract with VML . . . by performing the repairs in a[n] . . . unworkmanlike manner."). Because the Plaintiff has failed to offer evidence of any other type of contractual breach, I consider these two claims to be coextensive for purposes of the disposition of this motion.

shipyard." *Id.* at 100. The plaintiff must prove by a preponderance of the evidence that the alleged breach of the warranty caused the injury. *Id.* at 99. While circumstantial evidence may be used to prove causation, the circumstances must allow for such an inference. *Id.* at 101. "Exclusivity of control or possession is an important factor in supporting this inference." *Id.* The implied warranty of workmanlike performance is a legal standard, but "the question of what is required in a workmanlike performance is necessarily a factual question that naturally varies from case to case." *Point Judith*, 579 F.3d at 68.

For the same reasons as explained above, I cannot conclude that, in using only fifteen stands, Lyman Morse did not act with adequate diligence, attention, and skill, or that any blame for this decision lies fully with Lyman Morse. Although this is a different standard than a negligence standard, the same ambiguities in the record preclude summary judgment.

## III.   Spoliation

"[A] trier of fact may (but need not) infer from a party's obliteration of evidence relevant to a litigated issue that the contents of the evidence were unfavorable to that party." *Gomez v. Stop & Shop Supermarket Co.*, 670 F.3d 395, 399 (1st Cir. 2012) (quoting *Testa v. Wal-Mart Stores, Inc.*, 144 F.3d 173, 177 (1st Cir. 1998)). To be entitled to such an inference, the proponent must show three things: (1) "that the opposing party had notice of a potential claim," (2) "the relevance to that claim of the destroyed evidence," and (3) "that there is evidence that has been spoiled (i.e., destroyed or not preserved)." *Id.* District courts in this circuit consider five factors when determining the appropriateness of sanctions for spoliation: (1) prejudice due

to the evidence's destruction, (2) whether the prejudice can be cured, (3) the practical importance of the evidence, (4) whether the evidence was destroyed in bad faith, and (5) the potential for abuse if no action is taken. *See Driggin v. Am. Sec. Alarm Co.*, 141 F. Supp. 2d 113, 120 n.7 (D. Me. 2000). However, an adverse inference "usually makes sense only where the evidence permits a finding of bad faith." *Sharp v. Hylas Yachts, LLC*, 872 F.3d 31, 42 (1st Cir. 2017) (quoting *United States v. Laurent*, 607 F.3d 895, 902 (1st Cir. 2010)).

It is undisputed that Lyman Morse was on notice of VML's potential claims, that the boat stands are relevant evidence, and that Lyman Morse personnel moved some of the boat stands and other equipment in the early hours of November 10. But there remain genuine issues of material fact as to whether this evidence was "spoiled" or whether Lyman Morse acted in bad faith. When construing the facts in the light most favorable to the Defendant, I conclude that Lyman Morse acted in order to secure what was potentially a dangerous scene and in a manner that was consistent with the advice and opinions of the insurance representatives of both parties. I also must conclude at this stage that although Lyman Morse did not—indeed, there is no doubt that it could not—preserve the scene as it appeared upon discovery of *Vesper*'s fall, its personnel did the best that they could under the circumstances. Lyman Morse personnel claim to have tagged and photographed each of the boat stands and to have taken many photographs of the scene as soon as it was light enough to do so. Although the Plaintiff complains about the purported inadequacy of Lyman Morse's efforts, the Plaintiff never explains why these photographs were an insufficient means of

preserving the evidence or what Lyman Morse should have done in addition to or instead of what it already did. *See Sharp*, 872 F.3d at 42 (concluding that although the defendant had not inspected yacht's boom before it was replaced, an adverse inference jury instruction was not warranted because the defendant was given "scores of pictures and measurements" of the boom, as well as adequate time to inspect the boom before its replacement). Further, it is clear that VML's own representative, Captain Henderson, was one of the first to arrive at the scene.

I recognize that counsel for VML complained in a letter to Lyman Morse that "[m]uch . . . evidence had been moved again" in the aftermath of the fall, but this letter was sent after both parties had already conducted multiple joint inspections or surveys of the scene. Bate Letter 2. Even if counsel's accusation is true, the Plaintiff has not adequately explained why these joint inspections or surveys were insufficient and why Lyman Morse was not free to move evidence that had already been collected and documented. In addition, while the surveyors notified Mr. Graham in January 2019 that they had only inspected fourteen of the fifteen stands, Lyman Morse disputes this.[9]

I remain open to the idea that an adverse inference may be warranted upon a full hearing of the relevant facts, but when construing this limited factual record in the light most favorable to the Defendant, I remain unconvinced.

---

[9]     And, in any event, Lyman Morse claims to have re-labeled and photographed the fifteen stands and provided those photographs to counsel for VML. VML has not explained why, even assuming all fifteen stands had not previously been labeled and photographed, that remedy was insufficient.

**CONCLUSION**

For the reasons stated above, the Court **DENIES** the Plaintiff's motion for partial summary judgment (ECF No. 130).


SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 20th day of November, 2020.